TJOFLAT, Circuit Judge,
specially concurring:
The critical issues in this appeal concern evidentiary rulings. Frazier contends that the district court, abused its discretion when it barred his expert, Robert Tressel, from expressing his opinions (1) that “there is no forensic evidence to substantiate the claim of rape in this case,” and (2) that, if the victim’s claim of rape were true, “it would be expected that some transfer of either hairs or seminal fluid would [have] oceur[red].” Frazier also challenges the court’s decision to permit two FBI forensic investigators, Karen Lanning and' Anthony Onorato, to testify on rebuttal that the absence of hairs and seminal fluid does not mean that'no rapé occurred. I concur in the court’s, holding that the district court did not abuse its discretion in overruling Frazier’s objection to Lanning’s and Onorato’s testimony.[1] I also concur in the court’s affirmance of the district court’s rejection of Tressel’s opinions. The analytical model I use in reaching this result, however,. differs from the model the court uses. Because the difference is significant, an explanation is in order.
I.
A.
I begin by observing what happens after a party objects to the introduction of an expert witness’s opinion on the ground that the opinion is unreliable.[2] Assume that the party explains why the opiniqn is *1274 unreliable,[3] that the explanation may have merit, and that the court, recognizing this possibility, convenes a Daubert hearing.[4] Whether the proffered opinion is reliable is a question of fact. It is an ultimate fact not susceptible to direct proof, so it must be inferred from certain circumstantial facts, which the Supreme Court has referred to as “factors.”[5] The proponent of the opinion has the burden of establishing the ultimate fact of reliability by a preponderance of the evidence.[6] The proponent satisfies that burden by establishing to the trial court’s satisfaction circumstantial facts sufficient to yield the inference that the opinion is rehable.
If the proponent does this, and the court thereafter finds the opinion reliable, the court must admit the opinion unless it concludes that, though relevant and reliable, the opinion’s probative value is “substantially outweighed” by the considerations outlined in Federal Rule of Evidence 403.[7] If the proponent fails to es *1275 tablish circumstantial facts sufficient to yield the inference that the opinion is reliable,' or the court, after weighing the facts the proponent has established, -finds that the opinion is unreliable, the opinion is inadmissible as a matter of law.[8] Just as a coerced confession is inadmissible because it lacks probative value as to the issue of whether the defendant committed the criminal act to which he has “confessed,” an unreliable opinion is inadmissible because it lacks probative value as to thé factual issue it addresses.
B.
Identifying the circumstantial facts, or factors, that are to serve as the indicia of reliability in a given case is a matter committed to the trial court’s sound discretion.[9] In Daubert, the Supreme Court suggested that a trial court assessing the reliability of proposed scientific testimony might consider, among others, the following factors: (1) whether the theory' or technique underpinning the expert’s opinion “can be (or has been) tested”; (2) whether the theory or technique “has been subjected to peer review and publication”; (3) whether, with respect to particular theory or technique, there is a high “known or potential rate of error,” and whether there are “standards controlling the technique’s operation”; and (4) whether the theory or technique enjoys “general acceptance” within the “relevant scientific community.” Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-95, 113 S.Ct. 2786, 2796-97, 125 L.Ed.2d 469 (1993). Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), clarified that these factors may be considered in determining the reliability of -nonscientific expert opinion testimony as well. General Electric Company v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), offered an additional indicium of reliability: the analytical distance between the particular opinion offered and the data, principles, and methods from which it is purportedly derived.[10] The factors relied upon to test reliability, however, must be *1276 “tied to the facts of the particular case,” Kumho Tire, 526 U.S. at 150, 119 S.Ct. at 1175 (quotations omitted), and the trial court has “broad latitude” to determine which are appropriate indicia of reliability. Id. at 158, 119 S.Ct. at 1176.
C.
Understanding the model for determining the reliability of an expert’s opinion sheds considerable light on the operation of the standard a court of appeals employs in reviewing the trial court’s ruling on the opinion’s admissibility. We review a trial court’s decision admitting or excluding evidence for “abuse of discretion,” Old Chief v. United States, 519 U.S. 172, 174 n. 1, 117 S.Ct. 644, 647 n. 1, 136 L.Ed.2d 574 (1997); United States v. Abel, 469 U.S. 45, 54-55, 105 S.Ct. 465, 470-71, 83 L.Ed.2d 450 (1984), and this is true when we review rulings admitting or excluding the testimony of expert witnesses under Rule 702.[11] See Joiner, 522 U.S. at 146, 118 S.Ct. at 519; Kumho Tire, 526 U.S. at 152, 119 S.Ct. at 1176. A trial court abuses its discretion in making an evidentiary ruling “if it misapplies the law or makes findings of fact that are clearly erroneous.” E.g., Kelley v. Sec’y for the Dep’t of Corr., 377 F.3d 1317, 1333 (11th Cir.2004).[12]
What would a reviewing court say if the trial court, in determining whether an expert’s opinion was reliable, based its finding on irrelevant factors? [13] The answer is obvious. The reviewing court would say that the trial court misapplied the law and therefore abused its discretion.[14] What *1277 would the reviewing court say if the trial court based its reliability finding on crucial circumstantial fact findings that were clearly erroneous? Again,-the answer is obvious. The reviewing court would say that the trial court’s reliability finding amounted to an abuse of discretion because it was based on clearly erroneous findings of crucial circumstantial facts.[15]
II.
With this model for determining the reliability of expert opinion testimony in mind, I turn to the question of whether the district court abused its discretion in barring Frazier’s expert, Robert Tressel, from testifying to the two opinions at issue in this appeal.
Frazier sought to use Tressel, now a private forensic investigator, for the purpose of challenging the veracity of the victim’s claim that Frazier forced her into sexual intercourse and, thereby, her credibility as to whether she had been kid-naped. Tressel proposed to summarize the findings of the FBI’s forensic investigation of the car and the victims clothes, as well as the records of a medical examination of the victim, and to offer three opinions: (1) that “a thorough forensic investigation and a thorough rape examination of the victim ... were performed”; (2) that “there is no forensic evidence to substantiate the claim , of rape in this case”; and (3) that “it would be expected that some transfer of either hairs or seminal fluid would [have] oecur[red]” if the victim’s account were true.[16] Thus, Tressel sought to move analytically from the thoroughness of the investigation, the absence of forensic evidence, and his opinion that such evidence would be “expected” if the victim’s claims were true, to the implication that some hair or seminal fluid should have been, but was not, recovered, and that the rape therefore never occurred.[17] This, in turn, was meant to impugn the credibility of the victim, whose testimony provided the primary foundation for the kidnaping charge.
■ The district .court allowed .Tressel to, offer all of his proposed testimony except two of his ultimate opinions: that there was no forensic evidence to substantiate *1278 the claim of rape, and that the transfer of some hairs or fluids would have been “expected” if the victim’s claim were true. It is the exclusion of these opinions that Frazier now questions.
The district court did not abuse its discretion in excluding these opinions. The court correctly identified as crucial to the reliability of both opinions circumstantial facts that Tressel either did not attempt or was not qualified to establish, and Frazier offered no supplementary proof to establish these facts. Thus, Frazier failed to prove by a preponderance of the evidence that these two opinions were reliable, and the court implicitly found them unreliable. Because the court’s findings that Tressel’s opinions were unreliable were not clearly erroneous, the exclusion of these opinions was not an abuse of discretion.
A.
I first address the district court’s ruling excluding Tessel’s opinion that he saw “no forensic evidence to substantiate the claim of rape in this case.” The obstacle Frazier had to overcome to establish the reliability of this opinion was Tressel’s inability to negate the inculpatory power of one item of “forensic evidence” that squarely corroborated the victim’s story: bruising to and discoloration of the victim’s genital area discovered during a medical examination conducted shortly after she and Frazier were pulled from her wrecked automobile. To overcome this obstacle, Tressel attempted to provide an explanation for this bruising and discoloration that would not inculpate Frazier.
Tressel stated in his expert report, and proposed to testify at Frazier’s trial, that “[t]he documented finding of bruising around the labia major indicates that the bruising may be substantially older than only a few hours,” and that “[t]he only indication that any type of sexual activity occurred, ... the redness around the labia major and the redness of the cervix .... can occur during routine normal sexual activity.” Tressel implied that the bruising and discoloration was caused by sexual intercourse between the victim and her boyfriend, which, according to the victim’s medical records, had occurred two days before the alleged kidnaping.[18]
On cross-examination, however, Tressel acknowledged that he was not a physician and had no experience in the medical field. He had no training in pelvic examinations of sexual assault victims, nor had he examined the victim in this case. The district court reasonably (indeed, necessarily) recognized that the reliability of Tressel’s “no forensic evidence” opinion was, as Tressel had presented it in his report, dependent on the establishment of the fact that someone other than Frazier caused the genital bruising and discoloration. The court *1279 ruled that Tressel could not testify as to the cause of the bruising and discoloration because he was not qualified to do so; a physician would have to provide that testimony.[19] Frazier proffered no such testimony.[20] Because Frazier failed to present competent evidence of a circumstantial fact the court deemed essential to the admissibility of Tressel’s opinion, the court excluded the opinion. Although the court did not make an explicit finding that Tressel’s opinion was unreliable, it made an implicit finding to that effect. Because that implicit finding is not clearly erroneous, it cannot be said that excluding the opinion constituted an abuse of discretion.[21]
B.
Frazier also challenges the district court’s exclusion of Tressel’s opinion that, given the circumstances of the alleged rape, some transfer of hairs or seminal fluid between Frazier and the victim would have been expected.[22]
To support his opinion, Tressel purportedly relied on his extensive experience in forensic investigations, including investigations of sexual assaults, and several abstract factual propositions about the types of evidence found in sexual assault investigations and the factors affecting the likelihood of transfer and recovery. These abstract factual propositions are actually inferences that Tressel drew from a combination of (vaguely identified) law enforcement texts and his professional experience and training.[23] I number them for convenience:
(1) “The forensic evidence most commonly found during the analysis of a *1280 rape investigation is the transfer of hairs from the victim to the perpetrator and from the perpetrator to the victim.”
(2) “These hairs are routinely pubic hairs that become transferred [sic] during sexual intercourse.”
(3) “Head hairs can also be transferred during sexual assault and can be found in the clothing of the victim and the perpetrator.”
(4) “Seminal fluids are frequently found in sexual assault cases, especially when multiple episodes of sexual activity occur and no condom is used by the perpetrator. These fluids can be found not only in the orifices of the victim, but also on the clothing worn by both the victim and the perpetrator.”
(5) “The smaller crime scene, the more likelihood [sic] that you are going to find evidence to support a claim.”
(6) “The number of sexual encounters that occur between a suspect and victim raises the likelihood of some transfer of forensic evidence.”
Tressel apparently combined these circumstantial facts with the “very confined area” in which the rape allegedly occurred, the quantity and duration of the sexual acts it involved, and the lack of any mention of a condom being used to conclude that hair or seminal fluid transfers “would be expected” or “should” have occurred.
What troubled the court about Tressel’s “expectancy” opinion was that Tressel was unable to indicate the frequency with which hairs and seminal fluid transfers occur in sexual assault cases and, in particular, cases like the one at hand. Tressel could not testify to such frequency from his own experience, and he was unable to cite any published findings on the subject. Without some indication of the frequency with which hairs and seminal fluid are transferred during sexual assaults, the court concluded, it could not find reliable Tressel’s opinion that hair or seminal fluid transfers “would be expected” or “should” have occurred in this case. In my view, the court acted well within its discretion in placing great weight on this frequency factor. Thus, when Frazier failed to provide that missing link, the court was fully justified in striking Tressel’s opinion as unreliable.
The court’s focus on the transfer rates for hair and seminal fluid was entirely reasonable because Tressel’s “expectancy” opinion was not permissibly inferable from the circumstantial facts upon which he purportedly based it, and the most obvious gap in Tressel’s reasoning was his inability or unwillingness to say how often hairs and seminal fluid are transferred between victim and perpetrator during sexual assaults. Tressel’s “expectancy” opinion expresses an estimate of absolute probability. At minimum, it implies that, given the events alleged by the victim, it is more likely than not — that is, there is more than a fifty-percent chance — that a transfer would have occurred.[24] Most of the propo *1281 sitions upon which Tressel relied, however, are statements of relative probability— that is, -that a substance is more or less likely to be found under particular circumstances than others, or that one substance is more or less likely to be found than another. Without knowing the baseline at which we start — the average rates of transfer for hair and seminal fluids, generally or under particular circumstances— these propositions cannot support a statement of absolute probability like the one Tressel made. It helps none, for example, to know that the forensic evidence “most commonly” found is the transfer of hairs, or that hairs and seminal fluid are “more likely” to be found if the crime scene is small or if multiple incidences of sexual contact occur; since -we do- not know the baseline probabilities, we cannot say whether “most commonly” or “more likely” could be enough to move the probability of finding hairs or seminal fluids in a particular case over the fifty-percent boundary. In other words, without some indication of transfer rates, the court was unable to gauge whether it is possible for Tressel or any other expert to conclude that under a particular s.et of specific circumstances, one, would “expect” to find hair or seminal fluid transfers.
Some of the factual propositions upon which Tressel. relied — for example, that seminal fluid is “frequently” found, or that head hairs “can” be found on the perpetrator’s clothing — are statements of absolute probability, but they do not logically get us near the fifty percent mark. “Can” necessarily connotes only a bare possibility (something over one percent), and though “frequently” suggests something more, it does not connote “usually” or “most of the time” or in any way suggest that something happens “more often than not.”
Logically, then, the factual propositions Tressel relied upon, even if inferrable,[25] could not support his statement that hair or seminal fluid transfers should have oc *1282 curred, much less the implication the jury was to draw from this evidence, that hairs or seminal fluid should have been recovered,[26] Instead, the circumstantial fact upon which the reliability of Tressel’s opinion turns is the rate at which hairs or seminal fluid are transferred from the perpetrator and the victim. Without some evidence in this regard — whether from scientific studies or from Tressel’s personal experience, whether in the form of specific figures or general probabilities, and whether in sexual assault cases generally or in cases similar to this one — the court had no basis on which to find that Tressel’s opinion was reliable.
Yet Frazier produced no evidence on this point. On cross-examination at the Daubert hearing, the Government repeatedly invited Tressel to explain how his experience informed his “expectancy” opinion. Tressel pointed only to one case he had investigated in which the head hair and pubic hair of a serial rapist was found on four of the rapist’s victims, drawing no comparison between the facts of that case and those of this one. He offered no general observations about the frequency with which, in his experience, either hair or seminal fluid is transferred or recovered, much less the frequency of transfers in cases involving multiple episodes of unprotected sexual contact, and he stated that he was unaware of any studies that could provide this information. Because Frazier failed to produce any evidence on the circumstantial fact the court reasonably found crucial to the reliability of Tres-sel’s “expectancy” opinion, the court correctly excluded the opinion.[27]
*1283 Frazier argues, that the district court required that the opinion be based on published, scientific studies or scientific expertise that Tressel did not possess, and he sees this as evidence of a mistake of law— that is, that the court incorrectly assumed that Rule 702 requires that an opinion like Tressel’s have scientific foundations. The district court did not, however,, find Tres-sel’s opinion unreliable because it had no grounding in scientific studies;, it found the opinion unreliable because Frazier, who had the burden of proof, offered no evidence — experience-based or otherwise — on the factual issue the court correctly identified as central to the reliability of the opinion. To ask whether there are studies validating part of the testimony of a skill- or experience-based expert is not improperly to require that the testimony rest on scientific foundations :or that the expert have scientific expertise. See Kumho Tire, 526 U.S. at 157, 119 S.Ct. at 1178 (“Nor, despite the prevalence of tire testing, does anyone refer to any articles or papers that validate - Carlson’s approach.”). When the expert’s experiences have not alone been shown to be capable of providing a sufficient foundation for a particular opinion, corroboration from somewhere — whether in the opinions of other experience-based witnesses or .in published, scientific studies — is necessary to establish the opinion’s reliability. The district court made an implicit finding that Tressel had not sufficiently established how his experience led him to the opinion he offered. It then went on to require that, in the absence of such evidence, Frazier show that the opinion had some support in scientific literature. Requiring that the proponent of an expert opinion provide some basis for a determination that the opinion is reliable is never an abuse of discretion.
III.
In summary, the model for reviewing a trial court’s finding as to the reliability of an expert opinion requires that we uphold the finding unless the court abused its discretion in reaching it — that is, unless the court misapplied the law or based its finding on a clearly erroneous finding as to one or more circumstantial facts crucial to a finding of reliability. Keeping these points in mind, I think it clear that the district court did not abuse its discretion in arriving at its findings that Tressel’s opinions — that “there is no forensic evidence to substantiate the claim of rape in this case” and that if the victim’s claim of rape were true, “it would be expected that some transfer of . either hairs or seminal fluid would [have] occur[red]” — were unreliable. Frazier simply failed to establish by a preponderance of the evidence the circumstantial facts that the court, in the exercise of its discretion, identified as crucial and highly relevant indicia of reliability. Because the district court did not abuse its discretion in the manner in which it resolved the reliability issues, and because the court’s findings as to the opinions’ reliability were not clearly erroneous, the court was bound to exclude them. Indeed, the court would have abused its discretion had it permitted the jury to hear them.

. I also agree with the court's conclusion that Frazier failed to object at trial to Lanning and Onorato's opinions on the ground that they were unreliable and therefore inadmissible under Federal Rule of Evidence 702. See ante at 1268-69 n. 21. Finally, I agree with the court that if examined for plain error, the district court’s failure to determine sua sponte whether these opinions are reliable does not satisfy the first element of plain error: that an error occurred. Id. I cannot imagine a situation in which a court of appeals would hold that a district court has a duty to intervene on its own initiative and convene a Daubert hearing for the purpose of ascertaining whether an about-to-be-introduced expert opinion is reliable.

. In the following hypothetical scenario, I assume that the- expert is "qualified” and that the proffered opinion is relevant — that is, it "will assist the trier of fact to understand the evidence or to determine a fact in issue.” Fed.R.Evid. 702. Thus, I focus solely on the issue of reliability.

. In a criminal case, if the defendant, invoking his right under Federal Rule of Criminal Procedure 16(a)(1)(G), has obtained "a written summary of any testimony that the Government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence,” the defendant should be in a position to support his objection to the opinion of a government expert with an explanation of why he believes the opinion is unreliable. Under this scenario, the government would be entitled to reciprocal discovery under Federal Rule of Criminal Procedure 16(b)(l)(C)(i) and thus should be able to explain why it objects to the reliability of a defense expert's opinion. When, however, the opinion of an expert witness is proffered in rebuttal, the objecting party may not be able articulate specific reasons for believing the opinion to be unreliable. In this case, for example, because the Government called Lanning and Onorato in rebuttal, Frazier had not obtained summaries of their testimony or the bases for any opinions they might express. Consequently, he could not have been expected to provide a specific ground for objecting to their opinions. Nonetheless, as the court’s opinion points out, see ante at 1268-69 n. 21, Frazier made no objection based on Rule 702; his sole objection to Lanning and Onorato's testimony was based on his misguided argument that Rule 16 required the Government to give him prior notice of what their testimony would be. The court therefore had no obligation to hold a Daubert hearing before the Government elicited the testimony at issue.

. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999) (holding Rule 702 imposes an obligation upon federal trial courts to ensure that every item of expert testimony has "a reliable basis in the knowledge and experience of the relevant discipline.” (alterations and quotations omitted)).
Of course, the procedural handling of an objection to proposed expert testimony is a matter committed to the trial court’s discretion, and a formal Daubert hearing will not in all cases be necessary. In some cases, an evidentiary hearing is unnecessary because the parties' reciprocal submissions are sufficient to enable the court to resolve the reliability issue without taking live testimony. See Kumho Tire, 526 U.S. at 152, 119 S.Ct. at 1176 (stating that trial courts must retain the discretionary authority "both to avoid unnecessary 'reliability' proceedings ... and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises”).

. See, e.g., Kumho Tire, 526 U.S. at 153, 119 S.Ct. at 1176 (referring to the indicia of evi-dentiary reliability suggested in Daubert as "the specific factors identified in Daubert" and “Daubert's specific factors”).

. See Daubert, 509 U.S. at 592-93 & n. 10, 113 S.Ct. at 2796 & n. 10 (stating that the reliability issue is to be decided by the trial court under Rule 104(a), and that an opinion’s reliability must be proven by a preponderance of the evidence).

. Rule 403 provides,
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, *1275 waste of time, or needless presentation of cumulative evidence.
Fed.R.Evid. 403. We review a trial court’s exclusion of a relevant and reliable opinion pursuant to this rule under the abuse-of-discretion standard. See Old Chief v. United States, 519 U.S. 172, 174 n. 1, 117 S.Ct. 644, 647 n. 1, 136 L.Ed.2d 574 (1997).

. In determining whether a circumstantial fact, or factor, exists, the court conducts in a very real sense a miniature bench trial. The only difference between this bench trial and a bench trial held under the Federal Rules of Procedure is that the- Federal Rules of Evidence generally do not apply. See Fed. R.Evid. 104(a) ("Preliminary questions concerning ... the admissibility of evidence shall be determined by the court.... In making its determination it is not bound by the rules of evidence except those with respect to privileges.”).

. See Kumho Tire, 526 U.S. at 153, 119 S.Ct. at 1176 ( "[WJhether Daubert's specific, factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial court broad latitude to determine.”). Put another way, it is the trial court’s task to decide which factors are relevant to the opinion's reliability.

.Joiner clarified that, though the focus of the reliability inquiry "must be solely on principles and methodology, [and] not on the conclusions they generate;” Daubert, 509 U.S. at 595, 113 S.Ct. at 2797, "conclusions and methodology are not entirely distinct.” Joiner, 522 U.S. at 146, 118 S.Ct. at 519. Thus, even when an expert is using reliable principles and methods, and is extrapolating from reliable, existing data, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.” Id. "[Njothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected, to existing data only by the ipse dixit of the expert.” Id. This consideration has been incorporated into the text of the amended Rule 702, which requires not only that "the testimony [be] the product of reliable principles and methods” — the focus of the specific considerations offered in Dau-bert — but also that "the testimony [be] based *1276 upon sufficient facts or data," and that the witness be shown to have "applied the [reliable] principles and methods reliably to the facts of the case." Fed.R.Evid. 702.

. Rule 702 provides,
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Fed.R.Evid. 702.

. We apply the same standard in reviewing the admission or exclusion of expert opinion testimony. See, e.g., Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3rd Cir.2000) ("We afford a district court’s application and interpretation of Rule 702 plenary review, but we review the court's decision to admit or reject testimony under an abuse of discretion standard. An abuse of discretion arises when the district court’s decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." (quotations and citations omitted)); Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir.1999) (stating, in reviewing a Daubert ruling, that "[a] district court abuses its discretion if its conclusion is guided by erroneous legal principles, or rests upon a clearly erroneous factual finding" (citations omitted)).

. If, for example, a court were to exclude an expert's opinion on the ground that the expert has red hair, it would be a clear abuse of discretion. The reason, of course, is that the expert's hair color has no logical relevance to, and therefore lacks probative value on, the reliability of his opinion.

. The same would be true if the district court ignored factors that were plainly crucial to the reliability determination. I cannot imagine upholding a determination of the reliability of expert scientific testimony when the trial court ignored every consideration specified by tíre Supreme Court in Daubert. Indeed, in ruling on the admissibility of scientific testimony, the trial court might abuse its discretion if it failed to consider any of the considerations outlined in Daubert. See Kumho Tire, 526 U.S. at 152, 119 S.Ct. at 1176 ("[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors outlined in Dau- *1277 bert where they are reasonable measures of the reliability of expert testimony.”); id., at 159, 119 S.Ct. at 1179 (Scalia, J., dissenting) ("Though, as the Court makes clear today, the Daubert factors are not holy writ, in a particular case the failure to apply one or another of them may be unreasonable, and hence an abuse of discretion.”).

. The foregoing responses to the question, "What would the reviéwing court say?” assume that the trial court’s decision to admit or to exclude the expert’s opinion could have "affected” the complaining party’s "substantial rights” See Fed.R.Evid. 103(a). It goes without saying that the potential for undue prejudice — that is, for the denial of a party's substantial rights — should inform the trial court's decisions as to the timing and scope of the Daubert hearing and the heed for explicit findings of fact.

. I quote from the report Tressel prepared for Frazier’s attorney (the "report” or the "expert report”), Defendant's Exhibit 2, because it was on this report that the district court based its rulings. In his report, Tressel also stated: "The resulting laboratory findings in this case[] do not substantiate the claim of rape through forensic evidence.” At the Daubert hearing, Tressel said: "I see no forensic evidence to substantiate the claim of rape in this case.” He also said: "[T]here should have been some transfer of either hairs, fibers or fluids between the victims [sic] in this case.” ■

.In fact, at the Daubert hearing, Tressel’s ultimate opinion was elicited with the question, not whether the claim of rape was supported by forensic evidence, but whether, in Tressel’s opinion, the rape occurred. Defense counsel asked, “[B]ased on the information I provided to you, do you have an opinion about whether or nor a rape occurred in this cáse?” Tressel responded, "I do. I see no forensic evidence to substantiate the claim of rape in this case.”

. For his opinion that there was that there was no forensic evidence to substantiate the claim of rape, Tressel relied upon the following circumstantial facts:
All findings of the samples that were taken, all of which are essentially routine rape investigation procedures, were negative in finding a transfer of seminal fluid or hair from the defendant in this case. The medical examination of the victim only shows evidence of sexual activity on the part of the victim at some time prior to the examination taking place. The documented finding of bruising around the labia major indicates that the bruising may be substantially older than only a few hours.
Based on my review of the available documents, it is my professional opinion that there is no forensic evidence to substantiate the claim of rape in this case. The only indication that any type of sexual activity occurred is the redness around the labia major and the redness of the cervix. These two injuries, in and of themselves, can occur during routine normal sexual activity. [The alleged victim's] medical records indicate that she had sexual intercourse on 10/29/00.
Def. Ex. 2, at 2-3.

. The court said, “I am not going to allow him to testify about the bruising. I would a medical doctor but not a witness with these credentials, and particularly one who did not conduct the examination." This ruling was later reiterated:
[T]he primary evidence is going to produce negative reports in every area but one, and that's the question of the bruising....
I am not going to allow him to testify in his opinion those bruises were old or something. I just think that is not a field of his expertise. You have to have a medical opinion given on that....

. If Frazier had proffered a physician's (or other qualified expert's) opinion that the victim's sexual intercourse two days earlier probably caused the bruising and discoloration, defense counsel could have asked Tressel to assume the validity of the opinion and then asked him whether, in light of that opinion and his experience as a forensic investigator, he had an opinion regarding the presence or absence of forensic evidence of rape. Had this taken place, I suggest that the court would have permitted Tressel to give the opinion at issue.

. The court treats Tressel’s opinion that there was "no forensic evidence to substantiate the claim of rape” as Tressel’s ultimate opinion — that is, as one built on his other opinions, including that hair or fluid transfers "would be expected” if the victim's claims were true. See ante at 1265-66 n. 18. The court concludes that the district court properly excluded Tressel’s "no forensic evidence” opinion because it relied upon Tressel's "expectancy” opinion, which the district court properly excluded as unreliable. But Tres-sel's statement that there was "no forensic evidence to substantiate the claim of rape” is not, on its own terms, dependent on any foundational opinions about what forensic evidence one would have expected to find at the crime scene. Tressel did not offer the opinion that the victim had lied, that no rape had occurred, or even that the lack of forensic evidence contradicted the victim’s story. He testified only that there was no forensic evidence to substantiate the victim's claim, and this statement was dependent only on his finding that no fibers, hairs, or seminal fluids were recovered and his ability to explain away the victim's bruising.

. The record is silent as to whether any hairs or seminal fluid was found on Frazier's clothing or body following his arrest. Apparently, only the victim, her clothing, and her car were examined for such evidence.

. The law enforcement texts and the information Tressel gleaned from investigating sexual assaults provided him with the circumstantial evidence from which he inferred the abstract factual propositions. These proposi *1280 tions, in turn, served as the circumstantial facts for the ultimate inference Tressel drew— that is, that one would have "expected” that hair or seminal fluid transfers would have been recovered during the investigation of the rape that allegedly occurred in this case. '

. I do not agree with the court that the ambiguity of the phrase "would be expected” in any way affects the reliability of Tressel’s opinion. Lack of precision in expert testimony might properly form the basis for its exclusion, but such a ruling would be made under Rule 403, not under the reliability requirement of Rule 702. There is no requirement that experts use precise, as opposed to general, statements of probability. Indeed, Tressel would have only guaranteed the exclusion of his testimony on reliability grounds had he opined that there was a specific percentage chance that hairs or seminal fluid would have been transferred in this case, since it is patently impossible to state such an estimate with any confidence. That Tressel phrased *1281 his probability estimate in general terms made it much more likely that the estimate could have a basis in his experience as a forensic investigator.
Similarly, I do not agree that Tressel’s opinion could have properly been excluded under Rule 702 on the ground that it does not "assist the trier of fact to understand the evidence or to determine a fact in issue” because "Tressel’s imprecise opinion easily could serve to confuse the jury, and might well have misled it.” Ante at 1266. As the Supreme Court made clear in Daubert, the requirement that expert testimony "assist the trier of fact” "goes primarily to relevance,” 509 U.S. at 591, 113 S.Ct. at 2795; it is not a requirement that expert testimony be given in specific and certain terms. Again, if the ambiguity of expert testimony, and its concomitant potential to confuse the jury, is to form the basis for its exclusion, this ruling would properly be made under Rule 403, not Rule 702.
On the other hand, neither do I agree with Judge Birch's characterization of Tressel's opinion as “qualitative.” In expressing his opinion that hairs or seminal fluid "should ■ have been” transferred or that some transfer “would be expected," Tressel was making an inherently probabilistic statement. At minimum, it suggested that it was "more likely than not” (i.e., something more than a fifty percent chance) that such transfers would have taken place. Such a statement is general, and non-numerical, but it is certainly not "qualitative.”

. See supra note 23. I emphasize "if.” I have grave doubts about whether Tressel established the reliability of even the circumstantial facts upon which his opinion was purportedly based. On cross-examination, Tressel vaguely identified three texts, none of which were produced for the court: "Practical Aspects of Rape Investigation by Robert Hazelwood,” "a forensic science handbook by -Dr. Saperstein,” and "Crime Scene Search and Physical Evidence Handbook by Carl Cun- ’ ningham, United States Government Printing Office, 1973.” Contrary to Judge Birch's suggestion, however, see post at 5 n.3, Tressel did not “rely upon” these texts: he neither quoted from nor cited specific portions of them, nor did he provide excerpts for the district court to examine. The court consequently had no basis on which to conclude that they supported his testimony. Nor do these sources, to the extent they are identifiable, support -Tressel's testimony. The one text he clearly identified, Practical Aspects of Rape *1282 Investigation, does say that "hairs, fibers, blood, semen, and saliva appear with frequency in sexual assault cases,” and that "[t]he type of evidence most frequently associated with sexual assault investigations is semen.” See Practical Aspects of Rape Investigation 111 (Robert R. Hazelwood & Ann Wolbert Burgess ed., 1987) (emphasis added). But Tressel said neither of these things. Instead, he said that hairs transferred between victim and perpetrator are the forensic evidence “most commonly found,” that such hairs are “routinely ” public hairs, and that seminal fluids are “frequently found” (emphasis added). Even assuming that "found with frequency ” is synonymous with "frequeniZy found,” the quoted portions of text do not support the notion that the evidence "most commonly found” is hairs transferred between victim and perpetrator.
In any event, the court did not preclude Tressel from making these foundational statements, but instead precluded him from testifying that either hair's or seminal fluid "would be expected” in this particular case, an opinion that is an analytical chasm away from hairs and seminal fluid being "frequently found” in sexual assault cases generally. Among other patent logical gaps, Tressel never explained how his ultimate opinion was affected by the victim’s claim that Frazier never ejaculated, nor did he account for the fact that the search for forensic evidence included the victim, her clothing, and the car, but not, apparently, Frazier or his clothing. Even if the circumstantial facts upon which Tressel relied are entirely true, and Tressel had shown them to be so, they would not establish the reliability of his opinion that some hairs or seminal fluid "would be expected” in this case.

. Though Frazier did not object to the reliability of the testimony offered by the Government’s experts, Karen Lanning and Anthony Onorato, it bears noting the substantial gap between their testimony and Tressel’s proffered opinion. Lanning and Onorato offered (1) estimates of how often, in their experience, hair or seminal fluid evidence is recovered in sexual assault investigations, and (2) their opinion that the absence of such evidence does not necessarily mean that no assault occurred. Neither purported to say that, given these preliminary propositions and the facts of this particular case, one would not have "expected” to find hair or seminal fluid.

. It is true that the Government did not ask Tressel if he could state the frequency with which, in his own experience, seminal fluid or hair is found, and that the Government focused primarily on whether there was any "scientific literature” to support Tressel’s *1283 probability statement. But the Government did not have the burden of proving that Tres-sel's opinion was not grounded in his experience. Rather, Frazier, as the proponent of the opinion, bore the burden of establishing that the opinion was reliable. If Tressel was prepared to offer a probability statement from his own experience, whether specific (e.g., that he finds hairs in 75% or even 51% of his investigations) or general (e.g., that hairs are ■ "usually” found), it was Frazier's obligation to put that forward.